**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ———————————————— : | | |
| DAVID Q., : | | Civil Action No. 20-7176 (JMV) |
| Petitioner, : | | |
| v. : | | **OPINION** |
| JOHN TSOUKARIS, et al., : | | |
| Respondents. : | | |
| ————————————————: | | |

**VAZQUEZ, District Judge:**

This matter originated with Petitioner David Q.'s,[1] ("Petitioner") Petition for Writ of

Habeas Corpus pursuant to 28 U.S.C. § 2241.  D.E. 1.  Also pending before the Court is

Petitioner's Motion for a Temporary Restraining Order ("TRO").  D.E. 2.  For the reasons

detailed below, the Court will deny the habeas Petition and the Motion for a TRO.

### I.      Background

Petitioner is an immigration detainee being held by the Department of Homeland Security,

Immigration and Customs Enforcement ("DHS/ICE") at the Essex County Correctional Facility

("ECCF") in Newark, New Jersey.  The instant action was filed in the wake of the ongoing

COVID-19 pandemic,[2] that has been reported to have been contracted by both personnel and

detainees at ECCF.   D.E. 1 at ¶¶ 2-6.

---

[1] Petitioner is identified herein only by his first name and the first initial of his surname in order
to address certain privacy concerns associated with § 2241 immigration cases.  This manner of
identification comports with recommendations made by the Judicial Conference of the United
States' Committee on Court Administration and Case Management.

[2] COVID-19 is an abbreviation of the coronavirus disease 2019, a respiratory illness that can

Petitioner is fifty-nine years old and has been detained since February 24, 2020.   D.E. 1 at ¶ 12.   Petitioner, who is a legal permanent resident of the United States, is subject to mandatory detention under 8 U.S.C. § 1226(c).   D.E. 2 at 27, D.E. 11 at 25.   On August 1, 2019, Petitioner was served with a "Notice to Appear" charging him with being convicted of an aggravated felony as defined pursuant to Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"). D.E. 11-1 at 5.   Petitioner's criminal history includes a 2005 state conviction for aggravated sexual assault-kidnapping, aggravated assault with a deadly weapon, sex assault with physical force, and theft by unlawful taking for which he was incarcerated for fourteen years.   *Id.*, D.E. 2-11 at 4-5.

Petitioner was taken into ICE custody immediately after completing his state prison sentence.   On April 23, 2020, ICE denied Petitioner's COVID-19 related parole request.   D.E. 2-9.   On June 12, 2020, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 as well as a motion for TRO challenging the conditions of his confinement.   D.E. 1, 2.

Petitioner asks the Court, *inter alia*, to issue the writ of habeas corpus ordering his immediate release on the ground that his continued detention violates the Due Process clause or alternatively issue injunctive relief ordering his immediate release.   D.E. 1 at 48-49.   Petitioner also requests reasonable costs and attorney fees pursuant to the Equal Access to Justice Act "EAJA."   *Id.* at 49.

---

spread from person to person, that was declared a pandemic by the World Health Organization ("W.H.O.") on March 11, 2020.   *See* Centers for Disease Control and Prevention *Coronavirus Disease 2019 Frequently Asked Questions*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#covid19-basics (last visited Apr. 7, 2020); *see also* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post, https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/ (last visited Apr. 7, 2020).

On July 16, 2020, the Court convened a telephonic hearing with the parties to hear arguments.  D.E. 18.

**A. COVID-19**

The COVID-19 pandemic is at the heart of this case.  Judge John E. Jones III, in a thoughtful opinion, described the situation as follows:

> In a matter of weeks, the novel coronavirus COVID-19 has rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable. Large portions of our economy have come to a standstill. Children have been forced to attend school remotely. Workers deemed 'non-essential' to our national infrastructure have been told to stay home. Indeed, we now live our lives by terms we had never heard of a month ago—we are "social distancing" and "flattening the curve" to combat a global pandemic that has, as of the date of this writing, infected 719,700 people worldwide and killed more than 33,673. Each day these statistics move exponentially higher.

*Thakker v. Doll*, Civ. Docket No. 20-cv-480, --- F. Supp. 3d ---, 2020 WL 1671563, *2 (M.D. Pa. Mar. 31, 2020) (footnotes omitted).   Judge Jones accurately pointed to the swift growth of cases. Since his opinion dated March 31, 2020, the number of worldwide cases and deaths has risen from 719,700 and 33,673 to 16,114,449 and 646, 641.[3]

New Jersey has been particularly hard hit, with the northern part of the state bearing the initial brunt.   As of July 27, 2020, New Jersey had 179,812 cases and 13,884 deaths.   *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/ (last visited July 27, 2020). The total number of cases and deaths for Bergen County, Essex County, and Hudson County, respectively, were 20,280/1,782, 19,335/1,856 and 19,387/1,327 deaths.   *Id.*   New Jersey has

---

[3]  *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited July 27, 2020).

taken numerous steps, such as the Governor's initial stay-at-home order issued on March 21, 2020, to combat the virus and the decision to extend the public health emergency declaration for an additional thirty days.[4]   At the same time, the measures taken by New Jersey have led to tangible results.   While many parts of the country are experiencing surges in the number of cases, New Jersey has greatly reduced its daily infection and death rate.

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably between people."   *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html ("*How Coronavirus Spreads*") (last visited July 29, 2020).   The National Institutes of Health reports that the virus "is stable for several hours to days in aerosols and on surfaces[.]"[5]   COVID-19 is "spread mainly from person-to-person."   *Id.*   This person-to-person spread can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks.   *Id.*   The virus can also be spread by infected persons who are not showing symptoms.   *Id.*

Symptoms of COVID-19 can be mild. However, the effects of COVID-19 can be drastically more severe in older individuals or those with certain medical conditions, including persons with asthma, lung disease, heart diseases, diabetes, chronic kidney disease, liver disease

---

[4] *Murphy extends N.J. coronavirus public-health emergency for 30 days. State of emergency remains in effect*.   N.J.com,   https://www.nj.com/coronavirus/2020/05/murphy-extends-nj-coronavirus-public-health-emergency-for-30-days-state-of-emergency-remains-in-effect.html (last visited May 12, 2020).

[5] *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces    (last visited July 28, 2020).

or those who are immunocompromised.[6]   Besides death, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and can require extensive use of a ventilator.   Early evidence suggests that the virus "can damage lung tissue causing a 20 to 30 percent decrease in lung function[.]"   D.E. 1 at ¶ 29 (citation omitted).   In addition, complications from the virus can manifest rapidly.   *Id.*   (citation omitted).   To combat the virus, health officials have emphasized education, social distancing (*i.e.* staying at least 6 feet apart), and improved hygiene.   *Id.* (citation omitted).

### B.  Petitioner's Condition

Petitioner submits that the conditions at ECCF coupled with his age and living with health conditions such as obesity, hypertension, and borderline diabetes expose him to suffering severe complications or even death should he contract COVID-19.   D.E. 1 at ¶ 2.   He further submits that ECCF detainees are not supplied with protective equipment such as masks or gloves nor does the facility meet basic sanitary standards.   *Id.* at ¶ 3.   Petitioner states in a signed declaration that he is concerned about his inability to adequately social distance because detainees are in close proximity of one another.   D.E. 2-2 at ¶¶ 21-22.

Petitioner's medical records reflect that he has received ongoing care from ECCF medical personnel since his detention commenced on February 24, 2020.   D.E. 12-1.   The ECCF intake notes reflect that Petitioner denied having any medical limitations or disabilities.   *Id.* at 4. However, he self-reported that he had issues related to his prostate and that he took Flomax to treat those issues.   *Id.* at 4-5, D.E. 2-2 at ¶ 13.   At intake, a physician at ECCF ordered daily blood

---

[6] *People Who Are at Higher Risk of Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed July 28, 2020).

pressure testing and prescribed Petitioner 10 MG of Norvasc.   D.E. 12-1 at 8-9.   On February 27, 2020, Petitioner was prescribed 0.4 MG of Flomax.   *Id.* at 12.   On March 5, 2020, Petitioner refused medical screening for reasons not provided.   *Id.* at 13.   On April 4, 2020, a practitioner assessed "elevated blood pressure without diagnoses of hypertension."   *Id.* at 17.   On April 22, 2020, Petitioner was notified that his COVID-19 screening results indicated antibodies were present.   *Id.* at 22.   Petitioner did not make any medical complaints at that time.   *Id.*   Petitioner was placed in quarantine for two weeks and remained asymptomatic.   *Id.* at 24.   He was cleared for general population on May 6, 2020.   *Id.*   On June 14, 2020, Petitioner refused lab testing despite a lab order.   *Id.* at 26.   Petitioner provides that he was administered a second COVID-19 antibody screening on July 1, 2020, that yielded negative results.   D.E. 17 at 11-12.

Petitioner appended two declarations from Dr. Susan M. Lerner, M.D., a physician based in New York, who, while never having treated Petitioner, reviewed his medical records and spoke with him.   D.E. 2-3 at 1, D.E. 17-2.   Dr. Lerner opines that because of Petitioner's age, hypertension and obesity, he is at high risk of serious medical complications including death if he contracts COVID-19.   *Id.*   Dr. Lerner raises concerns with the level of care Petitioner is receiving at ECCF, noting for example, that his recent blood pressure levels indicate he has high blood pressure.   D.E. 17-2 at ¶ 4.   While Dr. Lerner acknowledges Petitioner was prescribed Norvasc at ECCF, she submits that there is no documentation of a hypertension diagnosis or of a treatment plan.   D.E. 17-2 at ¶ 4.   Dr. Lerner's declaration also provides that she was informed by Petitioner that he was diagnosed with borderline diabetes, although this is not reflected anywhere in his medical records.   D.E. 17-2 at ¶ 3.

### C.  ECCF Conditions

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure.

ICE Guidance on COVID-19, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.ice.gov/coronavirus (last visited on July 28, 2020).   For example, ICE temporarily suspended all social visitation at detention facilities.   *Id.*   ICE also released over 900 individuals who were at higher risk.   *Id.*   ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 as per Centers for Disease Control "CDC" guidance.   *Id.*   Further, ICE provided a list of health conditions that detention facilities should consider in favor of release.   D.E. 11-5 at 1-2

Respondents submitted an updated declaration from Alfaro Ortiz, the warden at ECCF, which details the efforts of ECCF to prevent and manage the virus.   D.E. 19-1.   As of the date of Ortiz's most-recent declaration, he confirmed the following number of COVID-19 cases.   There were no new positive test results for the six weeks prior to July 13, 2020.   *Id.* at ¶ 44.   Eight ICE detainees were previously reported to have been confirmed as positive cases.   *Id.*   Neither are there any new positive test results among the county inmate population for the four weeks leading up to July 13, 2020.   *Id.*   Additionally, only one county inmate who tested positive remains at ECCF,[7] and of the ninety-four members of the correctional staff who tested positive, ninety have been cleared to resume work at the facility.   *Id.*   All staff members who were in proximity of those who tested positive were sent home to self-quarantine for a fourteen-day period or sent to the hospital for testing.   *Id.*

In his declaration, Warden Ortiz details the efforts of ECCF to deal with the virus.   A major component has been keeping the population well below capacity in order to ensure adequate space to practice social distancing.   He reports that, among other things, ECCF is currently at

---

[7] County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed.   D.E. 19-1 at ¶ 44.

approximately 79 percent of its maximum capacity, and the ICE detention areas that are normally configured to house 60 detainees per pod, are now reduced to a maximum of 48 detainees.   D.E. 19-1 at ¶¶ 4-5.   The pods also permit all detainees to sit at least six feet apart.   *Id.* at ¶ 6.   Inmates' and detainees' recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing.   D.E. 19-1 at ¶ 20-e.   Social visits were suspended on March 22, 2020, and attorney visits can now be arranged in a dedicated room within the visitor's lobby wired to support video conferencing between the detainee and his attorney.   *Id.* at ¶ 20-j.

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several RNs, LPNs, nurse practitioners and physician assistants.   *Id.* at ¶ 12.   There is always a nurse practitioner in the facility twenty-four hours a day, and a physician at the facility sixteen hours a day.   *Id.* at ¶ 13.   A physician is on call on a 24-hour basis for emergency needs.   (*Id.*)   The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19, by housing them separately.   *Id.* at ¶ 19-f.   ECCF requires that all detainees and inmates undergo medical screening including temperature readings before admission in the facility.   *Id.* at ¶ 11.

If a detainee complains of COVID-19 symptoms, he is immediately evaluated and if that person exhibits COVID-19 symptoms, he or she is provided a mask.   *Id.* at ¶¶ 22, 28.   Moderate to severely symptomatic detainees are immediately taken to University Hospital for medical evaluation or COVID-19 testing.   *Id.* at ¶ 30.   Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results.   *Id.*   Asymptomatic detainees who have had

8

a known exposure to COVID-19, are "co-horted" with other similarly situated detainees, for fourteen days. *Id.* at ¶ 33.

ECCF is testing its population using rapid testing antibody screening. *Id.* at ¶ 45. The antibody screening differs from COVID-19 diagnostic screening as it is performed through a blood test to minimize risk to healthcare providers. D.E. at ¶ 45.

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19." *Id.* at ¶ 19-d. ECCF has an eleven-month supply of soap. *Id.* at ¶ 37. Detainees have unlimited access to free bars of soap although it is not antibacterial soap. *Id.* at ¶ 36. Ortiz expressly refutes any allegations from detainees of insufficient access to soap and disinfectant. *Id.* Additional cleaning staff have been hired in order to increase the frequency of cleaning each day, which includes frequent cleaning of highly-touched surfaces. *Id.* at ¶ 19-3. ECCF was designed with air handlers and a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours. *Id.* at ¶ 17.

## II.    SUBJECT MATTER JURISDICTION

Before conducting the injunctive relief analysis, the Court must determine whether Section 2241 permits Petitioner to seek the relief requested here. Respondents submit that the Court lacks jurisdiction to decide the matter pursuant to Section 2241. D.E. 11 at 16-23.

This Court, and several other district judges, have previously determined that Section 2241 is the appropriate vehicle for the injunctive relief sought. *See*, *e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020). At the time, Respondents did not argue against this analysis, instead asserting that petitioners lacked standing. Respondents,

however, have now challenged the Court's jurisdiction under Section 2241.[8]   For the reasons that

follow, the Court acknowledges that it is not clear whether Petitioner can maintain his action under

Section 2241, as a civil rights action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*,

403 U.S. 388 (1971),[9] or both.   However, it is equally clear to the Court that Petitioner will, at a

minimum, be able to proceed under either Section 2241 or *Bivens*.

---

[8] In a thorough opinion, Judge Bumb recently determined that Section 2241 does not permit
federal inmate habeas petitioners to challenge their conditions of confinement.   *Wragg v. Ortiz*,
Civ. --- F. Supp. 3d ---, No. 20-5496, 2020 WL 2745247 (D.N.J. May 27, 2020).   Judge Bumb
addressed a putative class action filed by federal prisoners, rather than a civil immigration
detainee like Petitioner.   In her opinion, Judge Bumb noted that respondents distinguished
federal inmates from civil immigration detainees vis-à-vis a Section 2241 analysis.   Judge Bumb
observed the following:

> Respondents concede, as they must, that some district courts have
> found habeas jurisdiction based on civil immigration detainees'
> risk of contracting COVID-19 in detention facilities. Not only are
> those cases not controlling, Respondents point out, but they are not
> persuasive *because civil immigration detainees do not have the
> same statutory or regulatory avenues for relief as prisoners who
> can seek home confinement through the CARES Act or make a
> compassionate-release request to the BOP and a motion to the
> sentencing court seeking compassionate relief under 18 U.S.C. §
> 3582(c)(1)(A). More importantly, Respondents distinguish the
> constitutional claims of civil immigration detainees from those of
> prisoners because they fall under the Fifth Amendment, which
> provides them "more considerate treatment than convicted
> prisoners."* (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G.
> v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5
> (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335,
> 344 (3d Cir. 2000))). Respondents suggest that different interests
> are at stake when considering whether to release a civil
> immigration detainee or a criminal defendant who is serving a
> sentence.

*Wragg*, 2020 WL 2745247 *16 (emphasis added).

[9] "*Bivens* is the short-hand name given to causes of action against federal officials for alleged
constitutional violations."   *Bistrian v. Levi*, 912 F. 3d 79, 88 (3d Cir. 2018).

As to the Court's authority to grant release on a writ of habeas corpus, the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) appears to acknowledge such authority. *Lucas* concerned a state prisoner's petition pursuant to 28 U.S.C. § 2254 rather than a civil immigration detainee matter.   *Id.* at 365-66.   The court in *Lucas* determined that the "extraordinary circumstances" standard controlled in determining whether "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."   *Id.* at 367.   As an example of such circumstances, the *Lucas* court pointed to *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), in which the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill.   *Id.* at 366-67.   Yet, the court in *Lucas* court continued, it was not suggesting that a petitioner's poor health would be the only situation that would meet the extraordinary circumstances standard.   *Id.* at 367.[10]

Respondents, however, point to a different line of Third Circuit cases that limit the reach of Section 2241, albeit in the federal inmate context.   In *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235 (3d Cir. 2005), the petitioner challenged Bureau of Prisons ("BOP") regulations.   The sentencing judge had recommended to the BOP that the petitioner serve the last six months of his sentence in a halfway house (a type of "Community Correction Center" or "CCC"), but the regulations prohibited such an early release.   *Id.* at 237-388, 240.   Ultimately, the Third Circuit found the regulations improper in light of the relevant statutes.   *Id.* at 244-50.

---

[10] Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

However, before reaching the substantive question, the *Woodall* court addressed whether the petitioner's claim was cognizable under Section 2241. *Id.* at 241. The court analyzed the two habeas statutes available to federal prisoners: Section 2241 and 28 U.S.C. § 2255; the former addressed "execution" of a sentence while the latter concerned the validity of a conviction or sentence. *Id.* (citing *Coady v. Vaughn*, 251 F. 3d 480, 485 (3d Cir. 2001).[11] The Circuit acknowledged that the "precise meaning of 'execution of a sentence' is hazy." *Id.* at 242. Yet, after analyzing cases from other circuits, the *Woodall* court settled on the plain meaning of execution, that is "to 'put into effect' or 'carry out.'" *Id.* at 242-43 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 794 (1993)). The Third Circuit then concluded that the matter involved an execution of the petitioner's sentence, and was therefore properly brought under Section 2241, because a transfer from a prison to a CCC represented "more than a simple transfer" or a "garden variety prison transfer." *Id.* at 243. *See also Ganim v. Fed. Bureau of Prisons*, 235 F. App'x 882 (3d Cir. 2007) (finding that Section 2241 did not apply because the Petitioner challenged a decision "relating to a simple or garden variety transfer" when the BOP refused to transfer the petitioner to another facility so that he could be closer to his family).

In another case, *McGee v. Martinez*, 627 F. 3d 933, 934 (3d Cir. 2010), the Section 2241 petition concerned the Inmate Financial Responsibility Plan ("IFRP"), 28 C.F.R. §§ 545.10, 545.11. The Third Circuit framed the issue as whether the petitioner could maintain the case under Section 2241 "or whether he must re-file it as a civil rights action under Bivens[.]" *Id.*

---

[11] The respondent in *Woodall* argued that conditions of confinement fell outside the reach of habeas, citing to, among other decisions, *Nelson v. Campbell*, 541 U.S. 637 (2004). *Id.* at 242 n.3. The *Woodall* court disagreed, finding that *Nelson* addressed the reach of 42 U.S.C. § 1983 before it invaded habeas jurisdiction. *Id.* (citing *Nelson*, 541 U.S. at 639). But, the court in *Woodall* continued, *Nelson* did not rule that habeas relief was unavailable even if the remedy was also permissible under Section 1983. *Id.*

12

The court in *McGee* observed that when a petitioner challenges a condition of confinement, and a favorable outcome would not alter his conviction or sentence, a civil rights action under *Bivens* or 42 U.S.C. § 1983 is appropriate.   *Id.* at 936 (citing *Leamer v. Fauver*, 288 F. 3d 532, 542 (3d Cir. 2002)).   The Third Circuit then indicated that the IFRP is designed to encourage an inmate to meet his financial obligations imposed at sentencing.   *Id.* at 936.   As a result, the Circuit continued, the IFRP is a means to execute a sentence.   *Id.*   The *McGee* court concluded that because the petitioner's case involved the execution of his sentence, it was properly brought under Section 2241.   *Id.* at 936-37.

The Circuit reached the opposite conclusion in *Cardona v. Bledsoe*, 681 F. 3d 533 (3d Cir. 2012).   In that case, the petitioner filed a Section 2241 action challenging the BOP's decision to place him in the Special Management Unit ("SMU").   *Id.* at 534.   Like *McGee*, the *Cardona* court once again framed the issue as whether the matter was properly brought under Section 2241 or whether the petitioner "must instead file a civil rights action under *Bivens[.]"*   *Id.* at 534; 537 n.9 ("We have held that a challenge to the conditions of an inmate's confinement may be brought in a civil rights action."   (citing *McGee*, 627 F. 3d at 936)).   The court in *Cardona* decided that the petitioner's action was not appropriate under Section 2241.   *Id.* at 538.   The Third Circuit reasoned that the petitioner had not alleged that the BOP's action was inconsistent with a recommendation or command in the sentencing judgment.   *Id.* at 537.   The Circuit then turned to the petitioner's claim that placing him in the SMU could lead to a loss of his good time credits, which could impact the length of his confinement.   *Id.* at 537.   The *Cardona* court rejected this argument because even if the petitioner won, it did not "necessarily imply" that he would serve a shorter sentence.   *Id.*   (citing *Leamer*, 288 F. 3d at 543).

13

The foregoing cases certainly seem to indicate – at least as to federal inmates – that an action which is not viable under Section 2241 can nevertheless be brought as a *Bivens* action. However, after these decisions, the United States Supreme Court in *Ziglar v. Abassi*, 137 S. Ct. 1843 (2017), addressed matters falling under *Bivens* and its progeny.  *Abassi* involved a suit by "six men of Arab or South Asian descent[,]" five of whom were Muslims, who were taken into custody as illegal aliens following the September 11, 2001, terrorist attacks.  *Id.* at 1852, 1853. While detained, the men were allegedly subject to harsh conditions of confinement along with both physical and verbal abuse.  *Id.* at 1853.  The detainees brought four claims under *Bivens*.  *Id.* The Supreme Court found that the *Bivens* claims challenged conditions of confinement and fell into two general categories:  "detention policy claims" and claims concerning the warden's permitting guards to abuse detainees.  *Id.* at 1858-59.

The Supreme Court traced the history of *Bivens*-type actions, starting with the seminal case in which the Court permitted a damages remedy for persons injured by an unreasonable search and seizure.  *Id.* at 1854 (citing *Bivens*, 403 U.S. at 397).   The *Abassi* Court noted that *Bivens* claims had only been extended to two areas:   gender discrimination by a Congressman in violation of the Fifth Amendment Due Process Clause and failure to provide medical treatment to a prisoner in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause.  *Id.* at 1854-55 (citing *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980)). However, the Court also pointed out that it had not extended *Bivens* to a number of other areas, including military matters and private prisons.  *Id.* at 1857 (citations omitted).   The *Abassi* Court attributed this change in *Bivens* jurisprudence not only to the facts of particular cases but also to a shift in the Supreme Court's analysis of such matters.  *Id.* at 1855.  As the Supreme Court recognized, it had adopted a cautious approach in extending *Bivens* to other constitutional

14

violations such that a *Bivens* remedy was now "disfavored."   *Id.* at 1855-57.   As a result, the Court in *Abassi* continued, it would not extend *Bivens* remedies "if there are 'special factors counseling hesitation in the absence of affirmative action by Congress.'"   *Id.* at 1857 (emphasis added) (quoting *Carlson*, 446 U.S. at 18).

As to special factors, the *Abassi* Court ruled that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."   *Id.* at 1857-58.   The Supreme Court added that certain matters – such as the military, the public purse, and federal land – in which Congress has "designed its regulatory authority in a guarded way" would counsel against an extension of *Bivens*.   *Id.* at 1858.   Other times, the Court continued, a particular "feature of a case" may caution against permitting a new *Bivens* action.   *Id.*   The *Abassi* Court added that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."   *Id.*

Turning to the claims before it, the Supreme Court first addressed the detention policy claims.   *Id.* at 1858.   The Supreme Court determined that the allegations constituted a new [12]

---

[12] The *Abbasi* Court also addressed a threshold issue, that is, whether the asserted *Bivens* claim was an already recognized cause of action or an attempt to create a new *Bivens* action.   To that end, the Court indicated the following:

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to

*Bivens* claim and were therefore subject to the special factors analysis. *Id.* at 1860. The Court described the detention policy claims as a challenge to the "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created" after the September 11 attacks. *Id.* The Court in *Abassi* ruled that a *Bivens* claim was an improper manner to challenge an entity's policy. *Id.* (citation omitted). Relatedly, the Court continued, discovery and litigation would veer into discussions and deliberations in formulating the policy. *Id.* at 1860-61. The *Abassi* Court continued that the detention policy claims would also require "an inquiry into sensitive issues of national security[,]" which weighed against a *Bivens* money damages claim. *Id.* at 1861. The Supreme Court further noted that Congress' inaction in the 16 years since the September 11 attacks also countenanced against finding a new cause of action. *Id.* at 1862.

The *Abassi* Court then observed that the detainees may have other avenues to pursue relief:

> [W]e have left open the question whether [the detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526, n. 6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal").
>
> Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions

> be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60.

16

immediately; yet this damages suit remains unresolved some 15
years later.

*Id.* at 1862-63 (emphasis and second alteration added).   As a result, the Court stated that the

detainees had other forms of judicial relief available which meant that a *Bivens* damages remedy

was usually not.   *Id.* at 1863 (citations omitted).

The Supreme Court concluded that it therefore would not extend *Bivens* to the detention

policy claims.   *Id.*   As to the second category – the warden permitting officers to abuse detainees

– the Court acknowledged that it may be a viable new *Bivens* claim but remanded the matter for a

special factors analysis in the first instance.   *Id.* at 1863-65.

Critically, the Court in *Abassi* limited its ruling to cases in which petitioners sought money

damages.   *See*, *e.g.*, *id.* at 1854 ("The Court . . . would enforce a damages remedy[.]"), 1857 ("The

question is 'who should decide' whether to provide for a damages remedy, Congress or the

courts?"   (citation omitted)); 1858 ("[T]he decision to recognize a damages remedy requires an

assessment of . . . .   [I]f there are sound reasons to think that Congress might doubt the efficacy

or necessity of a damages remedy . . . ."); 1861 ("Allowing a damages suit in this context . . . .

These considerations also counsel against allowing a damages claim to proceed . . . .   Were the

inquiry to be allowed in a private suit for damages . . . .")   The Supreme Court clearly delineated

an action for injunctive relief as opposed to one for damages.   *See*, *e.g.*, *id.* at 1858 ("It is true that

if equitable remedies prove insufficient, a damages remedy might be necessary to redress past

harm and deter future violations."); 1861 ("These concerns are even more pronounced when the

judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking

injunctive or other equitable relief.").   To this end, even when rejecting the application of *Bivens*

to detention policy claims, the *Abbasi* Court ruled that "[t]o address those kinds of decisions, detainees may seek injunctive relief."   *Id.* at 1862.

In light of the foregoing, the Court concludes that Petitioner may maintain this action under both Section 2241 and a *Bivens* claim for injunctive relief.[13]   *See Woodall*, 432 F. 3d at 242 n. 3. Alternately, the Court concludes that the Third Circuit will permit the action to proceed as either a Section 2241 matter or a *Bivens* claim for injunctive relief.   Moreover, whether the Court reviews Petitioner's claims under Section 2241 or *Bivens*, the Court must conduct the same substantive analysis, that is, whether Petitioner has shown that he is entitled to injunctive relief due to a violation of the Fifth Amendment's Due Process Clause.[14]

At the outset, the Court acknowledges that if Petitioner was a federal inmate, Third Circuit precedent would preclude an action under Section 2241.   Petitioner is not challenging the "execution of his sentence"; in fact, Petitioner has not been sentenced at all because he is a civil immigration detainee.   The Third Circuit has not ruled that Section 2241 is unavailable in this context.   And the Court finds persuasive the reasoning of respondents in *Wragg*, which Judge Bumb adopted:

> [B]ecause civil immigration detainees do not have the same
> statutory or regulatory avenues for relief as prisoners who can seek
> home confinement through the CARES Act or make a
> compassionate-release request to the BOP and a motion to the
> sentencing court seeking compassionate relief under 18 U.S.C. §

---

[13] The Court realizes that when seeking injunctive relief for an ongoing constitutional violation, *Bivens* may not be the technical nomenclature as *Bivens* actions can be interpreted to mean only matters seeking money damages.   Thus, to the extent necessary, the Court's decision encompasses actions seeking injunctive relief for ongoing constitutional violations whether the matter is technically categorized as a *Bivens* matter or not.

[14] The United State Court of Appeals for the Third Circuit recently heard oral arguments in *Hope v. Warden Pike Cnty. Corr. et. al.*, 20-1784, 956 F.3d 156 (3d Cir. 2020), which may provide further guidance once a decision is reached.

> *3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of prisoners because they fall under the Fifth Amendment, which provides them "more considerate treatment than convicted prisoners."* (Gov't Brief, ECF No. 28-1 at 54) (citing *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

*Wragg*, 2020 WL 2745247 *16 (emphasis added).

This reasoning is consistent with the Supreme Court's "necessity" of "use" observation as to habeas relief in *Abassi*.  *See* 137 S. Ct. at 1863.  The Court recognizes that the *Abassi* Court did not definitively hold that habeas relief was available to immigration detainees.  But at the same time, the Supreme Court also ruled that the detainees did have other forms of relief available to them, *id.*, which strongly suggests that the Supreme Court would find a habeas action cognizable, at least where necessity required it to do so.  Not only has this Court found Section 2241 to be applicable in civil immigration matters, so have numerous other district judges.  *See Jaime F. v. Barr*, Civ. No. 19-20706, 2020 WL 2316437 *2 (D.N.J. May 11, 2020) (citing case by way of examples).

The Court likewise finds that Petitioner can proceed with a *Bivens* action for injunctive relief, as opposed to money damages.  As noted, the *Abassi* Court took great pains to distinguish between injunctive relief and damages, concluding that the detainees could have sought injunctive relief – even as to the detention policy claims.  *Abassi*, 137 S. Ct. at 1862.  As a result, Petitioner here may also seek injunctive relief for the alleged constitutional violations.  Because *Abassi* did not prohibit an action seeking injunctive relief, the Court need not decide whether Petitioner asserts a new *Bivens* cause of action for money damages.  Nevertheless, as to the special factors analysis,

the Court notes that the Supreme Court's decision *Carlson v. Green*, 446 U.S. 14 (1980), concerning the Eighth Amendment is similar to the inquiry that the Court would have to conduct here.   Moreover, this Court has not ruled that ICE's overall, nationwide policy as to housing detainees is unconstitutional; instead, the Court has focused on particular facilities and how each has coped with the pandemic.   The Court has also considered the individual circumstances of each petitioner.

As noted, the Court is not aware of binding precedent that Section 2241 is not applicable to a civil immigration detainee alleging unconstitutional conditions of confinement.   The Court predicts that the Third Circuit will find, at minimum, that Petitioner can proceed under either Section 2241 or *Bivens* (for injunctive relief).   The Court recognizes that if the Circuit determines that Petitioner is foreclosed from seeking Section 2241 relief, it will be a major factor in determining that a *Bivens* action is viable.   *See Bistrian*, 912 F. 3d at 90 (3d Cir. 2018) (noting that in determining whether a new *Bivens* action should be recognized, two factors are "particularly weighty: the existence of an alternative remedial structure and separation-of-powers principles" (citation omitted)).   At the same time, the Court acknowledges that if a *Bivens* action is not available to Petitioner, then it may very well lead to the "necessity" of permitting a Section 2241 claim announced by the *Abassi* Court.   *Abassi*, 137 S. Ct. at 1863.

### III.    LEGAL STANDARD

The standard for granting a temporary restraining order is the same as that for a preliminary injunction.   Injunctions and restraining orders are governed by Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.   Injunctive relief may only be granted when a party demonstrates that he has a reasonable probability of success on the merits, he will suffer immediate and irreparable harm if the injunction does not issue, the grant of preliminary relief will not result in

greater harm to the nonmoving party, and the injunctive relief is in the public interest. *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citing *Crissman v. Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and ... when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

## IV.    DISCUSSION

The Court finds that Petitioner has not established a reasonable likelihood of success on the merits.   Petitioner is a civil detainee as opposed to a criminal prisoner who has been convicted and sentenced, therefore his conditions of confinement claim will be analyzed under the Due Process Clause of the Fifth Amendment, as opposed to the Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).   Civil immigration detainees are entitled to the same due process protections as pretrial detainees when the conditions of confinement fall below constitutional minimums. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019).

The Third Circuit has articulated the following relevant standards:

> To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees."

*E. D. v. Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). As a result, the Court must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose.   *Hubbard* 538 F.3d at 232.

A condition or purported deprivation amounts to punishment if the "disability is imposed for the purpose of punishment" in other words, there is "an expressed intent to punish on the part of detention facility officials;" no "alternative purpose to which may rationally be connected is assignable for it" or is "excessive in relation to the alternative purpose assigned [to it]."   *Bell*, 441 U.S. at 538 (internal citation omitted).   The "inquiry into whether given conditions constitute punishment must consider the totality of circumstances within an institution."   *Hubbard*, 399 F.3d at 160 (internal quotation marks and citations omitted).

District Courts have reached different conclusions when conducting this inquiry in the context of the current pandemic.   In *Dawson v. Asher*, Case No. C20-0409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020), Judge James L. Robart found that the immigration detainees did not face improper punishment.   *Id.* at *2.   Judge Robart explained that the petitioner's detention was reasonably related to a legitimate governmental objective because there was no evidence that the respondents intended to punish the petitioners, respondents had a legitimate governmental objective in preventing detained aliens from absconding and ensuring their appearance at removal proceedings, and the petitioners' confinement did not appear excessive in relation to the legitimate objective.   *Id.*

The district judge in *Thakker v. Doll*, Civ. Docket No. 20-cv-480, - F. Supp. 3d -, 2020 WL 1671563, *8 (M.D. Pa. Mar. 31, 2020), reached a different conclusion.   Judge Jones noted that an express intent to punish was not necessary and then found that the detention in question did not bear a rational relationship to a legitimate government objective.   *Id.*   Judge Jones reasoned that

housing immigration detainees in close proximity and in unsanitary conditions, in light of the pandemic, did not meet a legitimate governmental objective.  *Id.*  Judge Jones indicated that preventing aliens from absconding would constitute a legitimate governmental aim but this objective was deeply weakened in light of COVID-19, particularly when ICE had many other options to monitor civil detainees.[15]  *Id.*

The Court agrees with the *Thakker* court that COVID-19 alters the analysis.  And the Court also recognizes that jails are not designed with pandemics in mind.  However, courts that have found that the conditions did not bear a rational relationship to a legitimate governmental interest in light of the pandemic, have also indicated that the individual detainee's underlying health condition weighed heavily in its analysis.  *See, e.g.*, *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, *8 (D.N.J. Apr. 9, 2020); *Thakker*, 2020 WL 1671563, *4, 6.  The Court also agree that a petitioner's individual circumstances (that is, his or her medical condition) are critical to the analysis.

Petitioner argues that his age and underlying health conditions place him in a higher risk of suffering severe side effects of COVID-19.  Petitioner insists that the COVID-19 antibody screening results are not reliable indicators of whether he actually has the virus although his medical records reflect he has never complained of any COVID-related symptoms and generally presented with very few medical ailments.   He also submits that his detention is not necessary as he already served a prison sentence for his criminal conviction.   D.E. 2-2 at ¶¶ 33- 34.

Respondents state that Petitioner's description of the conditions at ECCF are inconsistent

---

[15] Since the TRO was granted in *Thakker*, Judge Jones has denied preliminary injunctive relief to several detainees, citing the facility's ongoing improvements in its response to COVID-19. *Thakker v. Jones*, Civ. Action No. 1:20-480, ---F. Supp.---3d, 2020 WL 2025384 at *11 (M.D. Pa. Apr. 27, 2020).

with Warden Ortiz's detailed declaration of the facility's response to the virus.   D.E. 11 at 27.
Respondents further argue that many of Petitioner's stated underlying health conditions are not
substantiated by the medical records and that even if they were, his continued detention is related
to a legitimate purpose.   *Id.* at 27-31.

According to the CDC, obesity puts a person at an increased risk of severe illness from
COVID-19, while hypertension or high blood pressure might put a person at an increased risk.[16]
The Court notes that Petitioner has not provided the Court with his body mass index ("BMI")
although he argues he is obese.   Petitioner's medical records provide that he is approximately 5
feet 10 inches and weighs 240 pounds.   D.E. 12-1 at 22.   Although Petitioner should have
provided his BMI, the Court assumes that he is obese.   As a result, the Court finds that Petitioner
is at an increased risk due to his obesity and may be at an increased risk due to his high blood
pressure.

Nevertheless, the record reflects that ECCF has been attentive to Petitioner's needs since
his detention began.   *See Saquib K. v. Tsoukaris*, Civ. Action No., 20-3489, 2020 WL 2111028 at
*5 (D.N.J. May 4, 2020) (denied deliberate indifference claim by a detainee living with high blood
pressure, citing the facility's monitoring and control of his condition).   Petitioner continues to
obtain medical treatment[17] for his medical complaints, and was even taken to an off-site hospital
on July 4, 2020, for head trauma resulting from a purported assault.   D.E. 17-4 at 1-4.

Importantly, the rate of positive COVID-19 cases among ECCF inmates and detainees

---

[16] The CDC's Guidelines provides that those with a BMI of thirty and above are at high-risk of
suffering the severe effects of COVID 19.   *See* https://www.cdc.gov/coronavirus/2019-
ncov/need-extra-precautions/people-with-medical-conditions.html#obesity (last accessed July 29,
2020).

[17] It is unclear whether Petitioner continues to be prescribed Norvasc for his high blood pressure.

continues to decrease.[18]   In other words, the affirmative steps taken by ECCF to combat the virus have shown positive results.   Critically, according to Warden Ortiz's most recent submission, ECCF had not had new confirmed case for the several weeks preceding July 13, 2020.

Moreover, the Court finds Petitioner's detention serves a legitimate governmental interest. Petitioner's criminal history is comprised of convictions for serious offenses including sexual assault.   The Court recognizes that Petitioner has served a significant period of incarceration for his criminal conviction, nonetheless, the government has a legitimate interest in ensuring the public's safety during the duration of his immigration proceedings.   Based on the medical care he is receiving at ECCF and his criminal record, the current conditions at ECCF are not excessive in light of the government's legitimate purpose.   *See Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134-35 (3rd Cir. 2017) (held that the government has a legitimate interest "in reducing the flight risk posed by prisoners facing removal.").

Under the totality of the circumstances, the Court does not find that Petitioner is likely to succeed on his claim.   Petitioner's claim is thus denied.

---

[18] Petitioner argues that the most up-to-date confirmed COVID-19 case numbers submitted by ECCF may be underreported as the antibody screening is unreliable.   D.E. 2 at 16, D.E. 2 at 18-19.

**V.        Conclusion**

The Court denies without prejudice the Petition for writ of habeas corpus pursuant to 28

U.S.C. § 2241 as well as the Motion for a TRO.   D.E. 1-2.   Because Petitioner's habeas Petition

and Motion for a TRO, are denied, he is not entitled to fees and attorney costs pursuant to EAJA.

An appropriate Order accompanies this Opinion.

Dated: 7/30/2020

                                                              _____
                                                              JOHN MICHAEL VAZQUEZ
                                                              United States District Judge